**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN P. FRATTI,** | : | |
| | : | **Civil Action No. 1:06-CV-1573** |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **THE PRUDENTIAL INSURANCE** | : | |
| **COMPANY OF AMERICA,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court are the parties' cross-motions for summary judgment, Magistrate Judge Smyser's report and recommendation, and Plaintiff's objections thereto. In his report and recommendation, Magistrate Judge Smyser recommends that the Court grant Defendant's motion for summary judgment and find that the Defendant properly denied coverage on the grounds that Plaintiff made material misrepresentations in his evidence of insurability form. After reviewing the abovementioned documents and the administrative record, the Court declines to adopt Magistrate Judge Smyser's report and recommendation. Plaintiff's objections are sustained. For the reasons that follow, the Court finds that Defendant acted arbitrarily and capriciously in denying Plaintiff's request for long term disability benefits, and will grant summary judgment for the Plaintiff.

I.      **BACKGROUND**

Plaintiff John P. Fratti, a 41 year old pharmaceutical sales representative at PDI, Inc., opted to participate in an employee welfare benefit plan known as the "Short Term Disability and Long Term Disability Coverage for All Employees of PDI, Inc." (Doc. No. 19, ¶ 1.) These short and long term disability insurance programs were provided by Defendant Prudential

Insurance Company of America.  (Id. ¶ 2; Doc. No. 16, ¶ 2.)

In order to obtain long term disability coverage through the plan, Plaintiff completed an

employee/member evidence of insurability form and signed the form on May 3, 2005.[1]

Statements in the evidence of insurability form that "are not complete and/or not true at the time

they are made" provide the insurer with a basis to "reduce or deny any claim or cancel . . .

coverage from the original effective date."  PRU 21.[2]  As part of his insurance paperwork,

Plaintiff denied being treated for or having trouble with his urinary system during the preceding

five years.  PRU 120.  Plaintiff also denied "currently" having "any disorder, condition

(including pregnancy), disease, or defect not shown above and/or . . . taking medication

prescribed or provided by a medical or other practitioner for any disorder, condition (including

pregnancy) disease or defect."  Id.; (Doc. No. 19, ¶¶ 4-5.)  Plaintiff's coverage under the

disability insurance policy, Group Policy Number 41745, became effective as of June 1, 2005.

(Doc. No. 19, ¶ 6.)

Prudential had sole discretion to determine eligibility for benefits under the plan.  (Id.

---

[1]  The Court notes that the parties refer to both May 3 and May 13, 2005 as being the date that the evidence of insurability form was signed.  (Compare, e.g., Doc. No. 17, at 19) (Defendant indicating that the form was signed on May 3); with (Doc. No. 24, ¶ 3) (Defendant indicating that the form was signed on May 13, 2005); see also (Doc. No. 32, at 3 n.1) (in a footnote to his brief in support of his objections, Plaintiff states that the form was signed on May 13, 2005).  Unfortunately, certain pages of the record that may have shed light on this issue, PRU 152-53, are mostly illegible.

Magistrate Judge Smyser relied upon the date of May 3, 2005, in his report and recommendation, and no party filed a formal objection on that basis.  Also, in denying the request for benefits, the Defendant was operating on its belief that Plaintiff signed the form on May 3, 2005.  (Doc. No. 1-2, at 7.)  The Court will refer to May 3, 2005, as being the date that the form was signed.

[2]  The Court will refer to the administrative record as paginated by Prudential with "PRU" followed by the page number.

¶ 7.)  Under the policy, disabilities "due to a pre-existing condition" are excluded from coverage. (Id. ¶¶ 8-9 ); PRU 42.  A participant is deemed to have a pre-existing condition if he received medical treatment, consultation, care or services or took prescribed drugs or medicines, or followed treatment recommendation in the three months just prior to the effective date of coverage.  (Doc. No. 12, ¶ 8); PRU 42, 52.  For Plaintiff, the pre-existing condition "exclusion " or "look back" period consisted of the months of March, April, and May 2005.

Several events occurring during this "exclusion period" are material to Plaintiff's subsequent request for long term disability benefits.  Plaintiff received his primary medical care from the physicians of West Shore Family Practice, P.C. ("West Shore").  His medical records with West Shore reflect that in 2004, his doctor recommended that Plaintiff have a testicular ultrasound.  PRU 281.  On April 11, 2005, Plaintiff called West Shore to explain that he never went for the testicular ultrasound discussed in his October 2004 visit.  Id.  The following day, Plaintiff underwent ultrasound studies of his testicles at Heritage Diagnostic Center.  PRU 302. The ultrasound report prepared by Dr. Bellissimo of Heritage Diagnostic Center noted some abnormalities with Plaintiff's testicles.  Id.  On April 13, 2005, West Shore referred Plaintiff to Dr. Beltz, a urologist, to evaluate the abnormal ultrasound.  PRU 281.  West Shore scheduled an appointment for Plaintiff with Dr. Beltz for April 14, 2004, but the record does not indicate whether Plaintiff actually met with Dr. Beltz on that date.  Id.  On April 20, 2005, Plaintiff was seen at West Shore; the records relative to that examination do not indicate whether Plaintiff had met with and received a diagnosis from Dr. Beltz, nor do they reflect a diagnosis of epididymitis or a urinary system problem.  PRU 275.  Plaintiff did consult with Dr. Beltz at some point, however, as reflected by Dr. Beltz's July 14, 2005, letter to Dr. Harker of West Shore, in which

Dr. Beltz explains that he "recently treated [Plaintiff] for urethral pain and probable urethritis.[3] He responded well to the Levaquin antibiotics."[4]   PRU 303.   The dates that Plaintiff underwent this course of Levaquin is disputed by the parties.

In August 2005, Plaintiff experienced testicular pain and was prescribed or received samples of the antibiotic Levaquin.  (Doc. No. 19, ¶ 15; Doc. No. 24, ¶ 15.)  Approximately one week after Plaintiff's August 2005 course of Levaquin, he began experiencing symptoms of tingling, inability to concentrate, ataxia, parathesis, and inability to balance.  (Doc. No. 19, ¶ 18.) Plaintiff maintains that these symptoms were caused by a severe reaction to the antibiotic (Doc. No. 19, ¶ 16), a contention that is supported by his primary care physician's description of Plaintiff as suffering from an "immunologic inflammatory polysystem reaction to ciprofloxin type antibiotic which produced neurologic sequelae."  (Id. ¶ 17.)  Defendants maintain that Plaintiff's symptoms were an autoimmune response secondary to the underlying infection in his testicular region, and refer to the reports of Drs. Castle and Hoke in support of this position. (Doc. No. 24, ¶ 16; see also Doc. No. 17, at 7.)  (But see Doc. No. 1-2, at 3, 8) (Defendant's denial of coverage letters state that Plaintiff's disability is "due to a reaction from the mediation Levaquin," not "due to" some underlying infectious process).

Plaintiff's medical problems were so severe that he was no longer able to work, and he

---

[3]  Urethritis is the inflamation of the urethra, which is "the membranous canal conveying urine from the bladder to the exterior of the body."  Dorland's Illustrated Medical Dictionary 1913-14 (31st ed. 2007).

[4]  Levaquin is "a broad spectrum quinolone antibiotic used in adults to treat lung, sinus, skin, and urinary tract infections caused by . . . bacteria."  "About Levaquin", available at www.levaquin.com (last accessed Sept. 30, 2008); see also id. "Why Levaquin is prescribed" and "Levaquin fact sheet" (detailing the various infections and conditions for which Levaquin is approved treatment).

ceased his employment as a pharmaceutical salesman on December 23, 2005.  (Doc. No. 19,

¶ 19.)  Plaintiff submitted a claim to Defendant for short-term disability benefits which

Defendant granted on February 2, 2005.  (Id. ¶ 20.)  When his condition did not improve,

Plaintiff submitted a claim to Defendant for long term disability benefits.  (Id. ¶ 22.)  Defendant

performed a more thorough review of Plaintiff's medical history, with Registered Nurse Sandra

Chapkovic reviewing Plaintiff's records and outlining medical treatment received by Plaintiff

during the relevant time period.  (Doc. No. 24, ¶ 24); PRU 171-73.  On March 22, 2006,

Defendant denied the request for long term disability benefits, citing the policy's "pre-existing

condition" exclusion.  (Doc. No. 1-2); see PRU 174-75.  Specifically, Defendant stated:

> After a review of the medical information in file, it was confirmed in
> the medical records that we received from Dr. Kunkle and West
> Shore Family Practice that you had been seen by in (sic) May 2005
> and were prescribed Levaquin.  During these visits you were treated
> for epididymitis[5] and were prescribed Levaquin.  At this time you
> are out of work due to a reaction from the medication Levaquin.
> Since you were treated for your condition and prescribed the
> medication Levaquin during the three month period preceding your
> date of coverage, and you went out of work within the first year of
> being covered for LTD benefits, the pre-existing condition exclusion
> applies to your claim for LTD benefits, and we are denying your
> claim for LTD benefits.

(Doc. No. 1-2, at 3.)

Plaintiff appealed the denial of long term disability benefits, and Prudential denied the

appeal, reiterating that the pre-existing condition exclusion applied and adding that Plaintiff's

---

[5]  Epididymitis is the inflamation of the epididymis, which is "the elongated cordlike
structure along the posterior boarder of the testis, whose elongated coiled duct provides for the
storage, transit, and maturation of the spermatozoa and is continuous with the ductus deferens.  It
consists of a head (caput epididymidis), body (corpus epididymidis), and tail (cauda
epididymidis)."  Dorland's Illustrated Medical Dictionary 639 (31st ed. 2007).

failure to disclose certain material information on the evidence of insurability form provided

another basis for denying coverage.  (Doc. No. 1-2.)  In its June 27, 2006, letter denying

Plaintiff's appeal, Prudential explained:

> that [medical record] documentation clearly supports that you
> received treatment, consultation, diagnostic measures and took
> prescribed drugs in April and May 2005, for Epididymitis (or painful
> urination).  Following a 10 day course of treatment this condition
> improved, as stated in Dr. Belz's July 14, 2005 letter.  However, as
> indicated above your records show that the condition reoccurred in
> August 2005.  At that time you were again prescribed and began
> taking the same medication (Levaquin), however it appears following
> completion of this course of medication, you developed problems
> with your balance and paresthesias of your feet, and pain throughout
> your lower extremities. . . .  Although you may not have incurred the
> same symptoms following your treatment in May of 2005, your
> records show that the symptoms occurred due to the treatment you
> received for Epididymitis.  Therefore, it is our determination that
> your disabling symptoms are due to a pre-existing condition as they
> were caused by, contributed by and/or resulted from your diagnosis
> of Epididymitis, for which you received treatment for during the 3
> months just prior to your effective date of coverage.

(Doc. No. 1-2, at 8.)  Prudential also advanced its contention that certain statements Plaintiff

made on his evidence of insurability form were material falsehoods: "[Y]ou clearly failed to

appropriately document and/or answer applicable questions with regard to your 'Urinary

System' problems and/or symptoms and diagnosis of Epididymitis.  It is our position, had you

straightforwardly documented your medical history, your application for Long Term Disability

benefits most probably would have been denied or your coverage would have been approved

with a rider excluding any disability caused by, related to or contributed to by your diagnosis of

Epididymitis."  (Id.)

In the action now before the Court, Plaintiff maintains that Defendant acted arbitrarily

and capriciously in denying his request for long term disability benefits.  Specifically, Plaintiff

6

maintains that the administrative record does not support a finding that he was suffering from, diagnosed with, or treated for epididymitis with Levaquin during the pre-existing condition exclusionary period.  (See, e.g., Doc. No. 30, at 2.)  Plaintiff also contends that nothing in the administrative record supports that Plaintiff either saw Dr. Beltz or took Levaquin before signing the evidence of insurability form on May 3, 2005.[6]  Id.  Finally, Plaintiff asserts that Defendant did not establish that he was suffering from the same condition in both May and August of 2005 and that the failure to link these incidents undermines the assertion that the August 2005 incident was due to a pre-existing condition.  (See, e.g., Doc. No. 30, at 3; Doc. No. 33, at 5-7.)

## II.    STANDARD OF REVIEW

### A.    Summary judgment standard

Summary judgment is appropriate if the "pleadings, the discovery and disclosures on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party, who is "entitled to every reasonable inference that can be drawn from the record."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000); see also A.W. v. Jersey City Public Schs., 486 F.3d 791, 794 (3d Cir. 2007).  However, the non-moving party may not simply sit back and rest on the allegations in his complaint; instead, he must "go beyond the pleadings and

---

[6]  To the extent that Plaintiff's filings may be construed to advance the argument that there is no basis in the record from which Defendant could conclude that Plaintiff consulted with Dr. Beltz during the pre-existing condition exclusionary period (March-May 2005), this argument is rejected.  Based on the Plaintiff's statement that he took Levaquin in May 2005, see PRU 131, the Court finds that Defendant could reasonably infer that Plaintiff consulted with Dr. Beltz at some time prior to the effective date of insurance coverage (June 1, 2005).

by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986) (internal quotations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." <u>Id.</u> at 322.

### B.      Review of an ERISA benefits denial

On its face, ERISA does not specify the appropriate standard by which courts should review eligibility decisions.  The Supreme Court has held, however, that the standard of review should be "guided by principles of trust law," <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 111 (1989), and that denial of benefits should generally be reviewed under a <u>de</u> <u>novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the benefits of the plan," <u>id.</u> at 115.  When discretion is afforded by the plan, a court must review eligibility decisions under an arbitrary and capricious standard.  <u>Abnathya v. Hoffman-La Roche Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993).  Under this standard, a court should not overturn an administrator's eligibility decision unless it is "without reason, unsupported by substantial evidence, or erroneous as a matter of law." <u>Id.</u>

The Third Circuit Court of Appeals has interpreted the Supreme Court's <u>Firestone</u> decision as requiring heightened review of discretionary decisions made by potentially partial plan administrators.  <u>Pinto v. Reliance Standard Life Insurance Co.</u>, 214 F.3d 377 (3d Cir.2000).  Thus, within this circuit, "when an insurance company both funds and administers [ERISA plan] benefits, it is generally acting under a conflict [of interest] that warrants a heightened form of the arbitrary and capricious standard of review." <u>Id.</u> at 378.  To tailor the standard of review to the

inherent structural conflict of interest, the Third Circuit has adopted a "sliding scale" approach, which requires district courts to "consider the nature and degree of apparent conflicts with a view to shaping . . . review of the benefits determinations of discretionary decisionmakers." Id. at 393. The factors to be considered when deciding how much deference to afford an administrator's decision (the Pinto factors) include: "the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company," id. at 392, as well as the "current status of the fiduciary," id. Finally, heightened scrutiny is warranted when there is "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits." Kosiba v. Merck & Co., 384 F.3d 58, 66 (3d Cir. 2004).

While the objections to the report and recommendation were under consideration by the Court, the United States Supreme Court decided Metropolitan Life Insurance Co. v. Glenn, in which the Court declared that a conflict of interest exists when a single entity "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." 128 S. Ct. 2343, 2346 (2008). The Court explained that once such a conflict is identified, reviewing courts "should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." Id. (citing Firestone, 489 U.S. at 115.) The Supreme Court reaffirmed and elucidated what it had previously set forth in Firestone, "namely, that a conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" Id. at 2350 (quoting Firestone, 489 U.S. at 115). "Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take

9

account of several different considerations of which a conflict of interest is one." Id. at 2351.

The Third Circuit has yet to address what impact, if any, the Supreme Court's decision in Glenn will have upon the framework it has articulated for evaluating ERISA claims where a conflict of interest is present.  At least one judge within the Middle District of Pennsylvania has concluded that "[t]he Glenn decision is not at odds with the method of analysis previously endorsed by the Third Circuit Court of Appeals," which calls for the potential conflict to be weighed in relation to other factors.  Wilce v. The Proctor & Gamble Disability Ben. Plan, No. 3:07-cv-0757, 2008 WL 4279522, at *7 (M.D. Pa. Sept. 11, 2008) (Caputo, J.).  This Court agrees with the reasoning of Judge Caputo, and likewise concludes that the Third Circuit's sliding scale approach remains the appropriate framework within which to evaluate ERISA claims such as the one now before the Court.

In this case, it is agreed that a heightened arbitrary and capricious standard of review is appropriate because Defendant both funds and administers the plan at issue.  (Doc. No. 17, at 11; Doc. No. 20, at 8.)  The parties do not agree, however, as to how much deference should be afforded to Prudential under a heightened review:  Plaintiff advocates for intense scrutiny, whereas Defendant suggests that the level of scrutiny should remain near the deferential end of the sliding scale.  Magistrate Judge Smyser determined that the Defendant's decision to deny Plaintiff's long term disability claim should be viewed with "skeptical scrutiny" (Doc. No. 28, at 6), a conclusion that neither party challenged in their objections to the report and recommendation.  Because of the existence of the inherent conflict of interest, Plaintiff's status as a former employee, see Post v. Hartford Ins. Co., 501 F.3d 154, 164 (3d Cir. 2007) (noting that "when the claimant is a former employee, any dissatisfaction with the claims handling

10

process is less likely to translate into a significant financial disincentive for the employer"),

certain irregularities in the claims process, and inconsistencies in communications with Plaintiff,[7]

the Court agrees that Prudential's decision should be reviewed at the middle to higher end of the

sliding scale.  Thus, this Court will review Defendant's decision with skepticism.

## III.   DISCUSSION

In its letters denying Plaintiff's request for long term disability benefits, Defendant

provided two reasons in support of its conclusion that Plaintiff's claim was not covered: first,

that the policy's pre-existing condition exclusion applied, and second, that Plaintiff made

material misrepresentations on his insurance application paperwork.  The Court will address

---

[7]  For example, in its March 22, 2006, letter denying long term benefits, Defendant relies upon its review of the medical records received from Dr. Kunkle and the West Shore Family Practice for the statement that Plaintiff was treated for epididymitis and was prescribed Levaquin in May 2005.  (Doc. No. 1-2, at 3.)  The Court has reviewed these records, and they do not support such a statement: there is no notation in these documents specifying that Plaintiff was diagnosed with epididymitis in May 2005 or that he received Levaquin for *that* condition during the relevant time frame.  See PRU 123, 223-25 (letters from Dr. Kunkle), see also PRU 276-303 (documents that appear to be part of West Shore's records on Plaintiff).  In fact, Plaintiff's medical records during the pre-existing exclusion period through July do not even mention a diagnosis of epididymitis; rather, Dr. Beltz opined in a July 14, 2005, letter that Plaintiff was treated for probable urethritis.  PRU 303.  Defendant has not adequately explained how it extrapolated from Dr. Beltz's diagnosis of probable urethritis that Plaintiff was actually suffering from a different condition, epididymitis, all along.

Additionally, there are notable gaps in the administrative record relied upon by Defendant, and while Defendant may not have a duty to make a good faith, reasonable investigation of Plaintiff's claim (Doc. No. 32, at 3-4), its decision must be supported by the record before it at the time the decision was made.  In this case, as will be discussed below, the timing of certain events and of Plaintiff's knowledge of his health conditions were exceptionally important to the bases that Defendant offered for denying the claim, and even with the documentation amassed by Defendant, there remain too many unanswered questions as to the sequence of events in this case to support the decision to deny benefits.

These are just a few of the concerns that the Court has with the Defendant's handling of Plaintiff's long term disability benefits claim, and they are offered to support this Court's conclusion that a heightened standard of arbitrary and capricious review is warranted.  Some of these irregularities and inconsistences are explored in greater detail below.

these contentions in turn.

### A.     Pre-existing condition exclusion

Defendant contends that Plaintiff's claim is excluded from coverage because he was seen by a doctor and received treatment for epididymitis during the pre-existing condition exclusion period (March 2005-May 2005), and because the medication prescribed to treat this condition, Levaquin, caused the August 2005 reaction that led to Plaintiff's disability.  (Doc. No. 1-2, at 3), (see also Doc. No. 1-2, at 8) ("Although you may not have incurred the same symptoms following your treatment in May 2005, your records show that the symptoms occurred due to the treatment you received for Epididymitis.")

Defendant's reliance on Plaintiff's purported May 2005 diagnosis of epididymitis as his pre-existing condition is troubling.  A review of the administrative record reveals no medical record prior to August 2005 reflecting that Plaintiff was, in fact, diagnosed with epididymitis earlier that year.  The only diagnosis that Plaintiff apparently received during that time was Dr. Beltz's opinion that Plaintiff probably had urethritis and was suffering from urethral pain.  PRU 303.  Based upon Plaintiff's admissions that he took Levaquin during May 2005, Defendant could reasonably infer that Plaintiff consulted with Dr. Beltz at some time in May of 2005.

Subsequent referrals to epididymitis occur in certain of Plaintiff's medical records, the first seeming to appear in an October 6, 2005, report by neurologist Narendra Dhaduk.  PRU 210 (October 6, 2005, report by Dr. Dhaduk states: "HPI: Patient had taken Levaquin for Epididymitis"); see also PRU 224 (January 24, 2006, letter by Dr. Kunkle, noting that "Plaintiff is a 41-year old man who following Levaquin for epididymitis developed a neurologic syndrome. . . ."); PRU 254 (January 9, 2006, psychiatric evaluation by Dr. Okamoto states that

"patient reports . . . he took a second course of Levaquin for epididymitis in August"); PRU 264

(March 9, 2006, outpatient evaluation by Dr. Morganstein contains statement that Plaintiff "was

treated by a Urologist for epididymitis and was placed on to a 10 day course of Levaquin").

However, none of the abovementioned medical reports suggests that the diagnosis of

epididymitis occurred prior to August 2005.[8]

While they may present with similar symptoms,[9] the conditions of urethritis and

---

[8] Defendant acknowledges some confusion as to when and by whom the August diagnosis of epididymitis was made.  (See Doc. No. 17, at 5, n.1.)

[9] According to the Mayo Clinic, symptoms of epididymitis include:

> a tender, swollen, red or warm scrotum; testicle pain and tenderness usually on one side – the pain may get worse when you have a bowel movement; painful urination or an urgent or frequent need to urinate; painful intercourse or ejaculation; chills and a fever that can last up to six weeks; a lump on the testicle; enlarged lymph nodes in the groin (inguinal nodes); pain or discomfort in the lower abdomen or pelvic area; discharge from the penis; blood in the semen.

Mayo Clinic Online, available at www.mayoclinic.com/health/epididymitis/DS00603/DSECTION=symptoms (last accessed Sept. 30, 2008) (punctuation and capitalization modified).
The Merck Online Medical Library, describes the symptoms of urethritis as follows:

> In both men and women, there is usually pain with urination and a frequent, urgent need to urinate. Sometimes people have no symptoms. In men, when gonorrhea or chlamydia is the cause, there is usually a discharge from the urethra. The discharge is often yellowish green when the gonococcal organism is involved and may be clear when other organisms are involved. In women, discharge is less common.
> Other disorders that cause pain with urination include bladder infection and vaginitis. In vaginitis, urination may cause pain because urine, which is acidic, irritates the inflamed vulva and lining of the vagina.

The Merck Manuals Online Medical Library, available at

epididymitis affect distinct portions of the male anatomy.  See Dorland's Illustrated Medical

Dictionary 639, 1913-14 (31st ed. 2007).  Defendant has pointed to no medical evidence or

analysis meaningfully connecting the May 2005 diagnosis of probable urethritis to the August

2005 episode of epididymitis, and this Court's review of the administrative record has uncovered

no medical professional who asserts that the May and August conditions were the same.[10]

    That the conditions urethritis and epididymitis are distinct is relevant to the determination

of whether Plaintiff should have been excluded from coverage under the plan's pre-existing

condition exclusion.  The plan excludes from coverage a "disability which . . . is due to a pre-

existing condition."[11]  PRU 42.  Under this language, Defendant would have to connect the May

2005 diagnosis of probable urethritis to the August 2005 diagnosis of epididymitis for which the

---

http://www.merck.com/mmhe/sec11/ch149/ch149b.html (last accessed Sept. 30, 2008).

   [10]  The only medical report arguably linking the two conditions is a February 2, 2006, report from John Hopkins Medicine that states:  "[T]he patient said that he had some testicular pain in 05/05 and he saw an urologist who did not quite know what the patient had, but thought possibly this was epididymitis and prescribed Levaquin. . . .  The patient then *had a return of the same uncomfortable symptoms* in 08/05 and took some Levaquin."  PRU 246 (February 2, 2006, report from John Hopkins Medicine) (emphasis added).  As noted above, urethritis and epididymitis can manifest in similar ways; a similar presentation and the ability to treat both with a broad spectrum antibiotic does not, however, mean that the conditions are the same.

   [11]  Notably, the plan's language as it relates to the pre-existing condition exclusion—specifically, the use of the causal phrase "due to"—is narrower than that used in other exclusions.  By way of comparison, the set of exclusions immediately preceding the pre-existing condition exclusion provides that "any disabilities *caused by, contributed to by, or resulting from* your: intentionally self-inflicted injuries; active participation in a riot; or commission of a crime for which you have been convicted under state or federal law."  PRU 41-42 (emphasis added).

    Interestingly, in denying Plaintiff's appeal, Defendant uses all of the "exclusion" terminology: "It is our determination that your disabling symptoms are due to a pre-existing condition as they were caused by, contributed to by and/or resulted from your diagnosis of Epididymitis."  (Doc. No. 1-2, at 8.)

second round of Levaquin antibiotic was prescribed.  Defendant has not done this; indeed,
Defendant has glossed over any distinction that may, and should, be made between the
conditions of urethritis and epididymitis.  (See, e.g., Doc. No. 17, at 6; Doc. No. 1-2, at 7-8).[12]

B.     **Evidence of insurability form**

In its June 26, 2006, letter, Defendant articulates a second basis upon which it denied
Plaintiff's claims for long term disability benefits: his purported failure to provide accurate
answers to questions contained in the evidence of insurability form that Plaintiff signed on May
3, 2005.  (Doc. No. 1-2, at 7-8.)  Specifically, Defendant asserts that Plaintiff "failed to
appropriately document and/or answer applicable questions with regard to [his] 'Urinary
System' problems and/or symptoms and diagnosis of Epididymitis."  (Id. at 8.)  It was upon this
alternative basis for denying coverage that Magistrate Judge Smyser recommend that this Court
grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary

---

[12]    Even if the Court were to accept that Plaintiff was misdiagnosed in May 2005 and
actually was, at that time, manifesting symptoms of the epididymitis later diagnosed and treated
in August 2005, the Court is still not convinced that the pre-existing condition exclusion would,
in fact, apply.  The Third Circuit has expressed its disapproval of broadly reading "look back"
provisions when a heightened standard of review applies.  See McLeod v. Hartford Life Ins., 732
F.3d 618, 624 (3d Cir. 2004) (rejecting insurance company's argument that it could "'read back'
a pre-existing condition for the purposes of excluding coverage when the condition itself was not
diagnosed in the look-back period, especially in a situation such as this where other diagnoses
were made as to the very symptoms that are now being attributed to the (alleged) pre-existing
condition").  Moreover, whether Plaintiff received, during the exclusionary period, diagnostic
measures and treatment "for" epididymitis, a condition that was at that time unknown or
misdiagnosed, is questionable at best.  See PRU 52 (a pre-existing condition is "a condition *for
which* you received medical treatment, consultation, care or services including diagnostic
measures . . .") (emphasis added); see also Lawson v. Fortis Ins. Co., 301 F.3d 159, 166 (3d Cir.
2002) ("When the patient exhibits only nonspecific symptoms and neither the patient nor the
physician has a particular concern in mind, or when the patient turns out not to have the
suspected disease, it is awkward at best to suggest that the patient sought or received treatment
*for the* disease because there is no connection between the treatment or advice received and the
sickness.") (emphasis added).

judgment.  (Doc. No. 28, at 8-10.)

The evidence of insurability form contained the following two questions:

> 5.      Within the last five years, has the [applicant] been treated for,
> or had any trouble with, any of the following: . . .
> m. Urinary System?[13]

> 6.      Does the [applicant] currently have any disorder, condition
> (including pregnancy), disease, or defect not shown above,
> and/or is he/she currently taking medication prescribed or
> provided by a medical or other practitioner for any disorder,
> condition (including pregnancy), disease, or defect?

PRU 122.  Plaintiff answered both of these questions by marking the "no" box, id., which

Defendant asserts was a material misrepresentation at the time that Plaintiff signed the form on

May 3, 2008.  Defendant maintains that Plaintiff's medical records clearly indicate that he had

been diagnosed with epididymitis[14] and was taking Levaquin at the time he signed this form.

(Doc. No. 1-2, at 8.)

The parties do not point to any portion of the plan or otherwise argue that Plaintiff was

---

[13]  Magistrate Judge Smyser's report and recommendation includes in its discussion that
Plaintiff responded negatively to question number five insofar as it pertains to "genital
disorders."  (Doc. No. 28, at 7-8); see also Stedman's Medical Dictionary 525 (27th ed. 2000)
(defining "disorder" as "a disturbance of function, structure, or both, resulting from a genetic or
embryonic failure in development or from exogenous factors such as poison, trauma, or
disease").
   Defendant never asserted that Defendant's answer to the "genital disorder" part of
question number five was the basis for its denial as coverage, so the Court will limit its
discussion to the grounds that Defendant did advance in its June 27, 2006, letter denying
benefits.  (Doc. No. 1-2, at 7-8) (specifically basing its alternative ground of denial on Plaintiff's
negative responses to question 5m, which dealt with his urinary system, and with question 6,
which dealt with any other current conditions or current medications).

[14]  As discussed above, the administrative record does not support a finding that Plaintiff
was diagnosed with epididymitis in April or May 2005.  To the extend Plaintiff did receive a
diagnosis from Dr. Beltz during that time, the doctor's July 14, 2005, letter reflects that the
probable diagnosis was of urethritis, not epididymitis.  PRU 303.

under a continuing obligation to update his responses to the evidence of insurability form through the effective date of coverage, so the question becomes whether Defendant had a sufficient basis to conclude that as of the date Plaintiff signed the form—May 3, 2005—any of his responses were materially untrue.  <u>See</u> PRU 21 ("If any of the statements you . . . make are not complete and/or not true *at the time they are made* . . .") (emphasis added).

As discussed above, the records upon which Defendant relies are far from "clear."  As the administrative record stands, it is unclear when Plaintiff saw Dr. Beltz.  One can conclude that Plaintiff consulted with Dr. Beltz sometime in the three months between his referral to Dr. Beltz on April 13, 2005, and July 14, 2005, the date that Dr. Beltz acknowledges having recently treated Plaintiff.[15]  PRU 281, 303.  Defendant argues that it is likely that Plaintiff attended the scheduled April 14, 2005, appointment (<u>see</u> Doc. No. 32, at 2), PRU 281, and speculates that Plaintiff would have received a diagnosis and prescription at that time; however, Plaintiff's own medical record demonstrates that West Shore's scheduling of an appointment does not automatically mean that Plaintiff attended the appointment, <u>see</u> PRU 281 (note to file made on April 11, 2005, that Plaintiff had not attended previously scheduled ultrasound appointment); <u>see also</u> PRU 280 (noting that Plaintiff cancelled previously scheduled cholesterol test).  In fact, the reason that Plaintiff underwent the ultrasound of his testes on April 12, 2004, was that he did not attend the ultrasound that West Shore scheduled for him on October 18, 2004.  PRU 281.

There is a dearth of information in the administrative record about the chronology of

---

[15]  As noted above, it is likely, based upon Plaintiff's admission that he took Levaquin during May 2005, that Plaintiff consulted with Dr. Beltz at some point in May.  When such a diagnosis was made by the physicians and communicated to Plaintiff is unclear on the existing record.

Plaintiff's interactions with Dr. Beltz.  And the Court, quite frankly, is unsure whether the condition for which Defendant denied coverage, epididymitis—a condition involving the inflamation of a duct that provides for the storage, transit, and maturation fo the spermatozoa, see footnote 5—would necessitate a positive answer to the question of whether the applicant "has been treated for, or had any trouble with . . . [his] urinary system,"[16] PRU 122. Additionally, Plaintiff's statements that he had taken Levaquin in May 2005, see, e.g., PRU 131, 254, are not incompatible with his position that he was not taking the antibiotic as of the date he signed the evidence of insurability form.

In sum, based upon the administrative record, it is unclear whether, as of May 3, 2005, Plaintiff (1) had been informed of Dr. Beltz's diagnosis that he probably had urethritis, a urinary system condition that would be subject to disclosure in response to question 5m, (2) was still suffering from urethral pain, or (3) was in the process of undergoing a course of prescription antibiotics for the urethral pain and probable urethritis.  Given the lack of information in the administrative record from which Defendant could properly determine *when* Plaintiff was treated for a condition subject to disclosure and *when* Plaintiff was undergoing a course of antibiotics *in relation to when* he signed the evidence of insurability form, and considering the heightened standard used to review Defendant's decision, the Court concludes that Defendant's denial of long term benefits because of Plaintiff's alleged misrepresentation of his medical history was arbitrary and capricious.

## IV.    CONCLUSION

---

[16]   A diagnosis of urethritis prior to the signing of the evidence of insurability form would call for an affirmative answer to this question.

The Court has reviewed Magistrate Judge Smyser's report and recommendation, the objections thereto, and the underlying motions for summary judgment.  The Court will uphold Plaintiff's objections to the report and recommendation.  The Court has reviewed Defendant's decision to deny Plaintiff's long term benefits request under a heightened arbitrary and capricious standard and concludes that it must be reversed.  Defendant's motion for summary judgment will be denied, and Plaintiff's motion for summary judgment will be granted.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOHN P. FRATTI,                    :
                                   :   **Civil Action No. 1:06-CV-1573**
    **Plaintiff**        :
                                   :   **(Chief Judge Kane)**
v.                                 :
                                   :
THE PRUDENTIAL INSURANCE           :
COMPANY OF AMERICA,                :
                                   :
    **Defendant**        :

## <u>ORDER</u>

**AND NOW**, this 30th day of September, 2008, upon consideration of Magistrate Judge Smyser's report and recommendations, the objections thereto, the underlying motions, and relevant law, and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1.    Plaintiff's objections (Doc. No. 29) to the report and recommendation are sustained;

2.    The Court declines to adopt the report and recommendation (Doc. No. 28) insofar as it is inconsistent with this memorandum and order;

3.    Defendant's motion for summary judgment (Doc. No. 16) is **DENIED**;

4.    Plaintiff's motion of summary judgment (Doc. No. 18) is **GRANTED**:

    Defendant **SHALL PAY TO PLAINTIFF** (a) appropriate long term disability benefits as of April 1, 2005, and continuing for so long as Plaintiff remains disabled under the terms of the plan or until his maximum benefit eligibility requires, and (b) pre-judgment and post-judgment interest at the statutory rate on all past due long term disability benefits owed to Plaintiff.

The Clerk of Court is instructed to enter judgment in favor of Plaintiff and against Defendant.


 s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania